UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 4:05CR705 CDP (AGF) |
| TARRANCE McDOWELL, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Tarrance McDowell. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress statements. (Doc. No. 15).

An evidentiary hearing was held on May 17, 2006. The government was represented by Assistant United States Attorney ("AUSA") Thomas J. Mehan, who was covering the hearing for AUSA Jennifer J. Roy. Defendant was present and represented by his attorney, Andrew J. Sottile. At the hearing, the government presented the testimony of Detectives Leo Rice and Thomas Bottini, both employed with the St. Louis Metropolitan Police Department (SLMPD), who were assigned to the Most Violent Offenders Program and Drug Enforcement Administration Task Force at the time of the events in question. Defendant presented the testimony of Elaine A. Mays, a neighbor of

Defendant's who witnessed some of the events. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

On September 2, 2005, Detectives Rice and Bottini were approached by an individual on the street (the "Informant"), who advised them that a man wearing a plaid shirt was armed with a pistol on the 2900 block of Sullivan. The detectives had seen the Informant on the street before, and had talked with him a few times, but did not otherwise know him. The area identified was very near where they were located, and the detectives decided to investigate the matter. Dets. Rice, Bottini, and Mueller drove to the area in an unmarked car, with Det. Rice driving and Dets. Bottini and Mueller riding as passengers. They were wearing raid jackets and bulletproof vests that had "Police" marked in florescent lettering.

They arrived at the 2900 block of Sullivan at approximately 12:15 or 12:30 a.m. Outside of 2917 Sullivan, which is a four-family residence, the detectives observed three individuals on the front steps and two on the sidewalk. See Govt. Exs. D, I & K. They pulled up about ten feet from the house and watched with their lights off. One of the two men on the sidewalk, later identified as Defendant McDowell, was wearing a baseball cap, and his clothing matched the description provided by the Informant. The detectives decided to approach. Dets. Bottini and Mueller began to exit with their flashlights, and

2

as they got out of the car, Det. Bottini announced, "Police." Defendant, who had been facing the detectives' car, turned and ran up the steps and across the yard, toward the gangway to the right of the residence. Govt. Exs. B, I, K & L. Det. Mueller chased after Defendant, while Det. Bottini went toward the other individuals who were in the front yard. Det. Rice, thinking Defendant might run down the street, put his car in reverse and began to back up.

As Defendant was running across the yard, he tripped over the metal piping along the right side of the yard and fell down. Govt. Ex. B.[1] As he began to get up, Det. Bottini saw a firearm fall out from the front of Defendant onto the lawn. He went to secure the firearm and had the other individual who had been on the sidewalk come up to the steps. Meanwhile, Det. Mueller continued to chase after Defendant, who ran toward the gangway. At the entry to the gangway, there was a six-foot chain-link fence and gate. Det. Mueller grabbed the back of Defendant as he was attempting to climb the fence. The fence gave way, and Defendant fell onto the sidewalk several feet inside the gangway, with Det. Mueller on top of him. Govt. Ex. C. Det. Rice, having seen Mueller tackle Defendant, stopped his car and ran toward the gangway with his flashlight.

Defendant continued to attempt to get up. He and Det. Mueller continued to struggle, and Det. Mueller kept trying to push Defendant down. Although Det. Rice testified that he did not see any exchange of blows, it is likely that there was an exchange

---

[1] The pipe or fencing that Defendant tripped over is circled in pen on Govt. Ex. B.

of blows between Defendant and Det. Mueller. When Det. Rice arrived, he grabbed Defendant's arms while Defendant was on all fours, causing Defendant to fall forward. Det. Rice was able to cuff Defendant's hands behind his back, after which there was no further resistance by Defendant. The detectives estimated that from the time Defendant began to run until he was subdued, approximately 20 seconds passed, with the struggle itself lasting perhaps 8-9 seconds, and less than one minute in any event.

After Defendant was subdued, Det. Bottini advised them of the firearm which he had retrieved and secured. Det. Rice advised Defendant that he was under arrest and advised him of his rights under Miranda, and Defendant stated that he understood his rights. At the time Defendant was advised of his rights, he did not appear to be under the influence of drugs or alcohol, and he appeared to be coherent and calm. There was blood on Defendant's face, and it appeared that he had bled from his nose and perhaps also from his lip. Govt. Ex. E. Defendant was taken to the front of the house, and Det. Bottini interviewed the other individuals who had been in front of the house. One of the individuals told Det. Bottini that there had been a shooting the night before, and that Defendant stated at that time that he had been shot before and was not going to get caught without a weapon and vest.

Det. Rice conducted a pat down of Defendant and found that he was wearing a bulletproof vest. See Govt. Ex. E. He then advised Defendant that he was under arrest for the additional charge of wearing a bulletproof vest. Det. Rice asked Defendant what he was doing with the vest, and Defendant stated that there had been a drive-by shooting

4

the night before, and that he was carrying a gun and wearing the vest so he would not get killed. At the scene, Defendant was asked whether he needed medical attention, and he said it was okay, he did not need medical attention. Defendant was then taken to the police station. The officers estimated they were at the scene approximately 15 minutes.

At the station, Defendant confirmed that he did not need medical treatment, and he signed a form declining such treatment. Govt. Ex. F. Defendant was taken to the computer room, which is a small room with a table and two chairs. Defendant was again advised of his rights. Det. Bottini presented Defendant with a written warning and waiver form and asked Defendant if he could read. Defendant confirmed that he could read, and Det. Bottini then asked him to review the form. After Defendant reviewed the form, Det. Bottini asked Defendant if he understood his rights and said, if so, to initial that he understood next to each of the paragraphs. Defendant said that he understood his rights and initialed each of the paragraphs in the Waiver Certificate, Part I. Govt. Ex. A. At the time, the only officers in the room with him were Dets. Rice and Bottini. Defendant was seated at the table and was not in handcuffs. Defendant was tired and disheveled, but appeared to be lucid and coherent. Neither of the officers had their weapons on them, and no threats or promises were made to Defendant. Defendant signed the waiver, acknowledging that he understood his rights and wished to voluntarily waive his rights and to make a statement. Dets. Rice and Bottini witnessed Defendant's signature on the waiver certificate. Defendant thereafter made a written statement in his

5

own handwriting, which stated:

> "The truck came thru shooting at people. I had the gun and vest for my protection. I was looking at the gun when the police came up. I ran and jumped the fence. My head hit the ground."

Defendant filled in his name on the portion of the form following the written statement which reads:

> I, ___Tarrance McDowell___, have read or have had read to me this statement which begins on page __ and ends on page __. I fully understand the contents of this entire statement made by me. The statement is true. I have initialed all corrections and have signed the bottom of each page containing the statement. I have made this statement freely without hope of reward or benefit, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement.

Defendant then signed Part II of the form, and his signature was again witnessed, at 1:15 a.m.

Later that night the detectives received a call from Central Partrol, where Defendant was being housed, advising them that Defendant said he was sore and had requested to go to the hospital. Dets. Rice and Bottini took Defendant to Barnes Hospital for treatment and for a determination whether Defendant was fit for confinement. In the car, Defendant complained of soreness to his head, and stated that he was sore from the fall over the fence. At the hospital, Defendant advised several medical personnel, including the admitting nurse and the attending physician, of the same story that was in his written statement, namely, that he had a gun, ran when he saw the police, fell over a fence and struck his head. It was determined that Defendant had an orbital fracture, and he was released from the hospital later that afternoon.

6

Elaine A. Mays, who lives at 2925 Sullivan, which is across the street and a few buildings west of 2917 Sullivan, testified on behalf of Defendant. Ms. Mays is a government Revenue Officer and previously worked for the Customs Service. Her testimony differs from that of the government's witnesses to the extent that she believes that while in the gangway, Defendant was beaten, and that one of the officers pointed a gun at Defendant's head. Ms. Mays first started paying attention to the situation at the point that one of the officers grabbed Defendant as he was running into the gangway. She left to call 911 while Defendant was still in the gangway.

Ms. Mays testified that she recognized Defendant from the neighborhood, and said she first became acquainted with him in approximately July 2005, and had him do odd jobs for her in the past. She said at some point Defendant advised her that he had previously suffered a gunshot wound to the head, but could not recall why he told her that. She said she was able to converse with Defendant.

At approximately 12:30 a.m. on the night in question, she was sitting on her front porch, and she noticed Defendant standing outside 2917 Sullivan talking with another individual. She saw some headlights come down the street, but at that time did not pay attention and was looking the other direction. She turned her attention to the scene when she heard car doors and commotion. From her front porch, she saw that two men had run up the lawn, and saw one of the men, the more heavyset of the two, grab Defendant from behind as he went into the gangway. She testified that several more cars then pulled up, and four or more additional people ran up and into the gangway. From her porch, she

could no longer see them once they entered into the gangway.

     Ms. Mays got up, went across the street, and looked down the gangway from the sidewalk in front of the street. She saw Defendant on the ground, on his stomach, with his head pointed toward the street. She said that the officer who initially tackled Defendant was standing to the right of Defendant and had his foot on Defendant's neck, and the taller officer was standing to the other side of Defendant, had his firearm pointed at Defendant's head, and said, "I'll kill you right now." She testified that there were at least six or more officers in the gangway, and that while she could not really see the others because it was dark, she heard stomping and kicking which she believed was the other officers beating Defendant. Mays said she heard a clicking sound, which she believed was Defendant being placed in handcuffs, and she believed that the beating continued after Defendant was placed in handcuffs. She said the beating she witnessed lasted minutes, and that she yelled at the officers to stop. One of the officers told her to stop where she was, and said something like, "Do you want to get arrested, too?"

     She said the officers then turned and talked to the other individuals who were on the steps, one of whom was frisked. At this point, Defendant was sitting up, with his feet toward the street, and she could see that his face was swollen and bloody. She left to call 911 and an ambulance, and called 911 several times. An officer responded to her and advised her how she could make a complaint. She did not file a complaint, but did thereafter provide a statement to Internal Affairs, the content of which was not offered at the hearing.

In several respects, Ms. Mays' testimony is not at odds with that of the officers. She confirms that Defendant apparently fled from the police, and that he was tackled from behind. She was not observing the scene at the time that Defendant first fled, and therefore cannot know whether Defendant tripped over the fencing prior to running into the gangway. After Defendant was placed in handcuffs and seated, which occurred prior to any questioning of Defendant, she observed no further physical violence toward Defendant. To the extent Ms. Mays' testimony differs from that of the officers – alleging a beating that lasted several minutes – the Court credits the testimony of the officers. Ms. Mays' ability to observe the scene, first from her front steps across and down the street, and then from the sidewalk, was limited. She acknowledged that while she heard kicking and stomping, she could not see the other officers in the dark gangway. In several places, Ms. Mays' testimony was also internally inconsistent, and inconsistent with the objective facts. For example, the undersigned cannot square Ms. Mays' testimony regarding the location and position of the various individuals in the gangway with the photographs of the scene and the partially knocked-down fence. Nor is her testimony regarding the source of Defendant's injuries consistent with the Defendant's own written statement and statements to the medical personnel. In any event, however, the fact remains that Ms. Mays did not observe Defendant following his arrest, and did not and can not testify as to whether Defendant waived his <u>Miranda</u> rights, or his level of comprehension when he waived his rights or made any statements to the officers.

**CONCLUSIONS OF LAW**

Defendant asserts that his oral and written statements were not voluntary, as they were the product of beatings and coercion by the police, and should therefore be suppressed. A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157, 168 (1986). This determination must be made based upon an examination of the totality of the circumstances surrounding the interrogation. Moran v. Burbine, 475 U.S. 412, 421(1986). "A waiver is knowing if it is 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' (citation omitted) It is voluntary if it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" United States v. Syslo, 303 F.3d 860, 865 (8th Cir. 2002) (quoting Moran, 475 U.S. at 421); accord United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (noting two distinct dimensions of the inquiry).

A different, but related, question is posed by Defendant's assertion that his statements were not voluntary. Even if Miranda warnings are given, statements that are coerced are subject to suppression. "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 433 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement

10

authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984); accord Dickerson, 530 U.S. at 433.

When the voluntariness of a statement is challenged, the government bears the burden to establish, by a preponderance of the evidence, that the statement was voluntary. United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir.), cert. denied, 534 U.S. 924 (2001); accord, Syslo, 303 F.3d at 866. "Whether a confession is involuntary is judged by the totality of the circumstances." LeBrun, 363 F.3d at 724. In analyzing the "overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressures to confess. Colorado v. Connelly, 479 U.S. 157 (1986); LeBrun, 363 F.3d at 724; Syslo, 303 F.3d at 866. The relevant factors include the length of the detention; the repetitive and prolonged nature of questioning; the accused's age, characteristics, physical condition, and experience with the criminal justice system; and the questioning tactics. Simmons, 235 F.3d at 1133. Similar factors are listed in 18 U.S.C. § 3501.

Defendant was advised of his Miranda rights prior to any questioning that took place at the scene, and was again advised of his rights, in writing, at the station. At the time, Defendant was 31 years old and, given his status as a felon, had prior experience with the criminal justice system. Although Defendant clearly had been injured during the course of his apprehension, he was lucid and declined medical attention. The force exerted by the officers had ceased once Defendant was subdued and placed in handcuffs. And the single question asked at the scene by Det. Rice, who was not the officer who first tackled and may have struck Defendant, occurred only after

11

Defendant had been taken to his feet, advised of his rights and of the reason for his arrest, taken to the front of the residence, frisked, and advised that he was also being arrested for wearing the bulletproof vest. Although there were several officers at the scene, only a single officer was questioning Defendant at the time, and no threats or promises were made to induce Defendant to make any statement regarding the bulletproof vest.

At the station, Defendant again declined medical treatment, and was advised of his rights a second time, in writing. He was seated in a room, with no handcuffs, and only two officers were present, neither of whom had their firearms. Again, no threats or promises were made to induce Defendant's waiver. On these facts, the Court finds that Defendant's waiver of his Miranda rights, both at the scene and at the station, was knowing and voluntary. See Turner, 157 F.3d at 155-56 (finding knowing waiver of rights though defendant impaired by low IQ, PCP intoxication, and mental illness); United States v. Rosario-Diaz, 202 F.3d 54, 69 (1st Cir. 2000) (waiver of Miranda rights found knowing though defendant's IQ in the middle 70s and defendant had no prior involvement with the criminal justice system, in light of testimony that defendant understood what was happening when she waived her Fifth Amendment rights).

For similar reasons, the Court finds that Defendant's statements were voluntary. Examining the relevant factors against the facts of this case, neither the length of Defendant's detention nor the length of time that Defendant was questioned weighs toward any finding of coercion. Defendant was questioned only briefly following his arrest and briefly again at the station. See Simmons, 235 F.3d at 1133 (two-hour interrogation found not lengthy); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (questioning a suspect for six or seven hours not coercive per se). The written statement made by him was made shortly after his arrival at the

12

station, and after a written advice of his rights. His statement was his own words and was made in his own handwriting. With regard to the environment, while there were several officers at the scene at the time Defendant made his oral statement, only one was speaking to Defendant at the time, and his interrogation consisted of a single question. See United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) (presence of sizeable team of police officer and a police dog in defendant's apartment dos not, without more, constitute "police overreaching" or coercion). As stated above, his later written statement took place in a computer room, with only two officers present, and there is no evidence that any threats or promises were made to induce his written statement. Though Defendant had been injured, there is nothing in this record to suggest his injuries critically impaired his ability to think clearly. See United States v. Cristobal, 293 F.3d 134, 138, 143 (4th Cir.) (confession voluntary though defendant in hospital following surgery, was in pain, and was taking pain medication), cert. denied, 537 U.S. 963 (2002). Moreover, it remains significant that Defendant, who had prior experience with the criminal justice system, was advised of his Miranda rights two times. Berkemer v. McCarty, 468 U.S. at 433 n.20.

Assuming, arguendo, that the officers' conduct in subduing Defendant could be viewed as coercive, there is nothing in this record to suggest Defendant's will was overborne. See Simmons, 235 F.3d at 1133-34 (confession voluntary where 17-year-old defendant, with IQ of 88, interrogated by police officers for over two hours, and police raised their voices often, misrepresented that accomplice was confessing, and reminded defendant he was facing death penalty and things would go better for him if he told the truth); Watson v. Detella, 122 F.3d 450, 454 (7th Cir. 1997) (confession voluntary though officer kicked defendant in head while apprehending him, to roust defendant from hiding spot); United States v. Slater, 971 F.2d 626,

636-7 (10th Cir. 1992) (confession voluntary though it followed high-speed chase, officers physically pulled defendant through his car window, and certain officers hit or kicked defendant during apprehension); United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (post-arrest confession voluntary though defendant thrown to the floor and handcuffed before being seated at table with one hand handcuffed to chair, officers advised defendant of seriousness of charges and that defendant's criminal history probably meant a tough sentence, and promised to inform district attorney of defendant's cooperation). Although Defendant stated in his written motion that he would testify that after the beatings and threats by the police, he was willing to admit to whatever the police coached him to say in order to prevent future beatings, Defendant offered no such testimony at the hearing, and there is no evidence in the record to support this assertion. To the contrary, Defendant declined medical treatment, both orally and in writing; reviewed, initialed, and signed a written waiver of rights; and proceeded to make a coherent written statement.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. No. 15] be **DENIED**.

Trial in this matter has been set for **Monday, July 17, 2006, at 9:00 a.m.**, before the **Honorable Catherine D. Perry**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may

result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 16th day of June, 2006.